**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

| | |
|---|---|
| SPORTS ENTERPRISES, INC., an Oregon corporation, | x <br> : <br> : <br> : |
| Plaintiff, | : Case No. 2:23-cv-2198 <br> : |
| - against - | : Demand for Jury Trial <br> : |
| MARVIN GOLDKLANG, an individual; M.S. GOLDKLANG & CO., INC., a New Jersey corporation, | : <br> : <br> : |
| Defendants. | : <br> : |
| | x |

## **COMPLAINT**

DAVIS WRIGHT TREMAINE LLP
John M. Magliery*
Mohammad B. Pathan
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Tel:  212.489.8230

TARLOW NAITO & SUMMERS LLP
Alexander Naito*
2014 NE Broadway
Portland Oregon 97232
Tel:  503.968.9000

*Attorneys for Plaintiff Sports Enterprises, Inc.*

\*pro hac vice application forthcoming

## L. CIV. R. 10.1 DISCLOSURE

Plaintiff: Sports Enterprises, Inc., 6700 Field of Dreams Way NE, Keizer, OR 97303
Defendant: Marvin Goldklang, 21 Coventry Road, Livingston, NJ 07039
Defendant: M.S. Goldklang & Co., Inc., 25b Hanover Road, Florham Park, NJ 07932

## NATURE OF THE CASE

1. This litigation involves a unique, century-long coalition between small-town minor league baseball clubs for the purpose of advocating for the common benefit of the enterprise that would become known as minor league baseball ("MiLB"). Starting in 1901, minor league teams and leagues, each of whom had separate relationships with various major league baseball ("MLB") clubs, joined forces to collectively bargain for their rights and benefits by forming the National Association of Professional Baseball Leagues, Inc. ("National Association"). The charter for National Association stated its objectives, which included: "promote and protect the interest of such baseball leagues as may qualify to operate under [the NAA]"; and "maintain and further develop a strong relationship with [MLB] based on mutual respect and consideration while *enhancing the continuing advancement and growth* of those people who serve the game". And for over 100 years, MiLB successfully battled against the goliath of MLB and its vastly superior financial position by remaining unified. However, in the most recent negotiations with MLB, defendant Marvin Goldklang, along with several other owners of minor league teams, took over negotiations and, instead of working on behalf of the entire membership, undermined the negotiation process to secure their own private deals to benefit themselves. In doing so, Goldklang not only destroyed the Salem-Keizer Volcanoes, a minor league team owned by plaintiff, he also increased the value of his ownership interest (and that of his company M.S. Goldklang & Co., Inc.) in various professional baseball teams by over $40 million overnight.

## PARTIES

2.  Plaintiff Sports Enterprises, Inc. ("SEI") is an Oregon corporation with its principal place of business in Marion County, Oregon. SEI owns and operates the Salem-Keizer Volcanoes, formerly a minor league baseball team (the "Volcanoes"). For 26 years prior to 2021, the Volcanoes were a member of the National Association of Professional Baseball Leagues, Inc., dba Minor League Baseball and a Class Single-A (low) affiliate of the San Francisco Giants, a professional baseball team with Major League Baseball ("MLB"). Following the 2020 season, the Volcanoes became an independent baseball club with no affiliation with any MLB club.

3.  Defendant Marvin Goldklang is an individual who, on information and belief, resides in Essex County, New Jersey.

4.  Defendant M.S. Goldklang & Co., Inc. ("Goldklang Group") is a New Jersey corporation with its principal place of business in Essex County, New Jersey.

5.  On information and belief, at all relevant times, Mr. Goldklang and/or Goldklang Group was and is the majority owner of the Charleston RiverDogs. Prior to 2021, the RiverDogs were a member of the National Association and a Class Single-A (long season) affiliate of the New York Yankees of Major League Baseball.

6.  On information and belief, prior to 2021, Mr. Goldklang and/or Goldklang Group was the majority owner of the Hudson Valley Renegades. Prior to 2021, the Renegades were a member of the National Association and a Class Single-A (low) affiliate of the Tampa Bay Rays of Major League Baseball. Following the 2020 season, the Renegades became a Class A (high) affiliate of the New York Yankees.

7.  On information and belief, at all relevant times, Mr. Goldklang and/or Goldklang Group was and is the majority owner of the St. Paul Saints. Prior to 2021, the Saints were an independent baseball team with no affiliation with Major League Baseball. Following the 2020

2

season, the Saints became a Class AAA affiliate of the Minnesota Twins of Major League Baseball.

## JURISDICTION AND VENUE

8. This court has subject matter jurisdiction pursuant to 28 USC § 1332 because the amount in controversy exceeds $75,000 and the dispute is between citizens of different States.

9. This court has personal jurisdiction over defendant because Mr. Goldklang is a resident of the State of New Jersey and subject to personal jurisdiction in a court of general jurisdiction in the State of New Jersey pursuant to N.J. Ct. R. 4.

10. Venue is proper under 28 US Code § 1391 because defendant resides in the State of New Jersey.

## BACKGROUND

*A.    The National Association*

11. On September 6, 1901, various minor baseball leagues and clubs formed the National Association to advocate collectively for the rights and benefits of minor league baseball leagues and minor league clubs nationwide. The National Association and its members leagues and clubs are hereafter collectively referred to as "Minor League Baseball" or "MiLB".

12. Since at least 1903, the National Association, on behalf of its minor league club members, negotiated various agreements with the Office of the Commissioner of Baseball (the "Commissioner"), the unincorporated entity governing all major league baseball clubs and leagues. The Commissioner and its member leagues and clubs are hereafter collectively referred to as "Major League Baseball" or "MLB". Specifically, the National Association negotiated and entered into various professional baseball agreements ("PBA") with MLB.

13. In 1990, the National Association and MLB agreed to certain modifications to the prior PBA. Specifically, the 1990 Professional Baseball Agreement ("1990 PBA") contained one significant change from previous editions: MLB agreed to at all times have its major league

3

clubs maintain an affiliation with a minimum number of minor league clubs (at the time, 119 total minor league affiliations). In essence, the 1990 PBA served as a grant of exclusive right to an affiliation for all National Association members.

14. The 1990 PBA also standardized the affiliation process, by creating a uniform Player Development Contract ("PDC") that would be executed by each major league club and any affiliated minor league club.

15. The National Association and its member leagues and clubs, including the Volcanoes the RiverDogs, and the Renegades, were governed by a National Association Agreement (as amended, the "NAA"). In short, every minor league club with an exclusive right to an MLB affiliation was a member of the National Association and a party to the NAA.

16. The NAA provides for, among others, the following:

- The objectives of the National Association include (i) to "promote and protect the interests of such baseball leagues as may qualify to operate under" the NAA; and (ii) to "maintain and further develop a strong relationship with [MLB] based on a mutual respect and consideration while enhancing the continuing advancement and growth of those people who serve the game."

- No member shall "enter into any negotiation to become a member of or in any way cooperate with any organization of professional baseball clubs whose existence will in any manner conflict with the letter and spirit of this Agreement, or the interest of any of the clubs operating under it ***."

- The National Association "shall not become party to any agreement that would result in the immediate cessation of operations of any member league or club that is in full compliance with its obligations under this Agreement and the [PBA]."

- Members shall pay an annual fee.

4

- Members shall retain certain territorial exclusivity rights.

17. The NAA acted as the "constitution and bylaws" of the National Association and its member leagues and member clubs.

18. The NAA incorporates MLR 54 and retains independent approval authority over any transfer of ownership of its member clubs.

19. The NAA further provides that the National Association be governed by a Board of Trustees (BOT), which delegates authority to a President (similar to the structure of board of directors and corporate officers). The BOT and the President each have various duties and responsibilities, which are set forth in the NAA.

20. The most recent iteration of the PBA occurred in 2004 (the "2004 PBA"), which was effective from October 1, 2004, through September 30, 2020. The 2004 PBA, together with the Major League Baseball Rules ("MLRs"), which were incorporated verbatim into the 1990 PBA and 2004 PBA, set forth the terms and conditions of the relationship between the National Association and MLB.

21. The 2004 PBA expanded the membership of the National Association and the number of exclusive affiliations that would be maintained with MLB clubs from 119 to 160. The 2004 PBA also set out the specific leagues from the National Association which qualify as "Minor Leagues" under the MLRs. The 2004 PBA calls out four separate levels of the minor leagues: (i) Class AAA; (ii) Class AA; (iii) Class A (full season); and (iv) Class A (short season). A minor league's level designation directly affects the number of games it plays, the type of players it gets, and, ultimately, the team's value as an organization (the higher levels being significantly more valuable).

*B.     The Volcanoes*

22.     In 1989, Jerry Walker and his former business partner William Tucker acquired SEI, which at the time owned and operated the Bellingham (Washington) Mariners and later the Bellingham Giants.

23.     In 1994, SEI entered into a four-year term PDC (to begin during the 1995 season) with the MLB club known as the San Francisco Giants (the "Giants") for SEI (first as the Bellingham Giants and later as the Volcanoes) to be the Giants' short season single-A team affiliate playing in the NWL.  The PDC incorporated all the terms and conditions as set forth by MLB and MiLB in the PBA.  For the next 26 years, through the end of 2020, SEI continuously maintained a contractual relationship with the Giants (through two-year extensions of that PDC).

24.     In 1997, in reliance on its membership in the National Association and the protections afforded under the NAA, SEI re-located the team to Keizer, Oregon.

25.     Since at least 1989, SEI and its owners contributed substantial sums, as well as time, supporting the National Association, including without limitation payment of membership fees,

26.     From 2015 to present, SEI invested approximately $500,000 in upgrades to the stadium and surrounding facilities, many at the direct request of the Giants.  These upgrades included adding a 5,200 sq./ft. indoor hitting facility and batting cages and adding a players' lunchroom and coaches' locker-room.  Prior to that, SEI had also added a 1,000 sq./ft weight room.

27.     On information and belief, in 2018, the Tri-City Dust Devils, a Class A – Short Season team and member of the National Association, received an offer to be purchased for $8.1 million.

28.     At all material times, SEI was a member in good standing with the National Association under the NAA.

6

*C.     MLB's Contraction*

29.     In early 2019, MLB began discussions with the National Association regarding negotiation of a new PBA.  As part of those initial discussions, MLB proposed contraction of some minor league clubs as part of the new PBA.

30.     In October 2019, MLB prepared and published an initial proposed contraction list of the 43 teams that would not be included under the new agreement (the "Contraction List").

31.     Following the disclosure of the Contraction List, the National Association, through its president, Pat O'Conner, notified MiLB members that MiLB would never agree to contraction of some of its teams and that MiLB would remain united.

32.     During the course of these initial discussions regarding a new PBA, the National Association specifically told MLB that loss of an affiliation with a major league club would result in the contracted minor league teams going out of business.

33.     Initially, Pat O'Conner led the negotiations for a new PBA on behalf of MiLB. However, later in 2019 and into 2020, a new negotiating committee was formed by members of MiLB to represent MiLB in its negotiations with MLB.  Pat O'Conner delegated his "plenary and exclusive power over relations with Major League Baseball" under the NAA to negotiate a new PBA, to a committee of minor league club owners and representatives that included Goldklang, as well as other owners and representatives of minor league clubs, including Andy Sandler, Joe Finley, Tom Volpe, and D.G. Elmore (collectively referred to as the "Negotiating Committee").  Jerry Walker twice volunteered to serve on the Negotiating Committee but was denied the opportunity.

34.     On information and belief, the members of the Negotiating Committee all had some direct or indirect ownership interest in the following minor league clubs:  (i) Emeralds; (ii) AquaSox; (iii) Inland Empire 66ers; (iv) Lynchburg Hillcats; (v) San Antonio Missions; (vi) Idaho Falls Chukars; (vii) Kannapolis Cannon Ballers; (viii) Delmarva Shorebirds;

7

(ix) Stockton Ports; (x) Lehigh Valley IronPigs; (xi) Hudson Valley Renegades; (xii) Charleston RiverDogs.

35. O'Conner tasked the Negotiating Committee with negotiating an extension of the existing PBA or a new similar type of agreement with MLB on behalf of its member leagues and all 160 minor league clubs.

36. The Negotiating Committee owed fiduciary duties to all other members of the National Association, including SEI.

37. The Negotiating Committee withheld information regarding the negotiations with MLB from the National Association and its members, including information indicating that MLB proposed eliminating the National Association and replacing it with a system of franchises or license agreements entered into directly between the major league club and the minor league club affiliates.

38. In and around April 2020, O'Conner expressed concerns internally about the authority of the Negotiating Committee to negotiate a franchising/licensing agreement that "bypassed or eliminated the [National Association] and its Leagues completely." In response, the Negotiating Committee "strongly disagreed" with O'Conner's "efforts at transparency with the membership" and persuaded him to wait until they received MLB's proposal, as opposed to developing a "Plan B" in case a new PBA could not be reached.

39. At the same time, in April 2020, the Negotiating Committee represented to the National Association membership that it was encouraged by the progress and had reached agreement on a number of points with MLB.

40. In May 2020, the Negotiating Committed represented to the National Association membership that any new agreement with MLB would need to be voted on by all league members.

41. Contrary to the representations by the Negotiating Committee, on information and belief, the Negotiating Committee was secretly negotiating the terms of the new franchise system that MLB wanted. On May 14, 2020, the Negotiating Committee submitted to MLB a list of 14 "Proposed Agreement Principles." As part of those principles, the Negotiating Committee proposed a limited minor league system of only 120 teams, with two new teams that had not previously been affiliated with MiLB, a minimum season length of 140 games for all minor league teams, and certain other restrictions for the "protection of franchise equity values" of the minor league teams. Another "principle" proposed by the Negotiating Committee stated:

> "MLB to indemnify MiLB, its leagues, members and representatives against any liability related to a new agreement including but not limited to claims by owners of teams that currently have a PDC but MLB has determined will not get a Standard License under the new agreement and teams that MLB has determined will receive Standard License to play in a lower level league than that team is currently playing in."

42. In and around May 2020, O'Conner issued a written notice to all minor league clubs and their representatives, including all members of the Negotiating Committee, reminding them that pursuant to the terms of the NAA and MLR, they were prohibited from entering into "any negotiation to become a member of or in any way cooperate with any organization of professional baseball clubs whose existence will in any manner conflict with the letter and spirit of the [NAA], *or the interest of any of the clubs operating under it \*\*\**" (emphasis added).

43. On or about August 27, 2020, MLB responded to the Negotiating Committee's initial proposal with its "MiLB Business Plan," adopting many of the "principles" proposed by the Negotiating Committee, including a plan to replace the PBA system with a new franchise-based system and reduce the number of minor league clubs from 160 to 120. Specifically, MLB proposed to: (a) reorganize MiLB into a fewer number of leagues with a total of 120 affiliated MiLB teams; (b) end its affiliation with 40 other MiLB teams; and (c) eliminate the National Association and the PBA and replace it with a franchise/license system involving Professional

9

Development Licenses ("PDLs") between major league clubs and select minor league club affiliates.

44. According to the MiLB Business Plan, under the new venture, MLB would provide "all services currently provided by MiLB and Individual League Offices (e.g., umpires, scheduling, events, administration, etc.)." Further, MLB would "serve[] as Agent and Share[] 50/50 in Net Revenue Generated with MiLB Clubs, after expenses associated with running MiLB." That 50/50 revenue split of net national and regional marketing revenue was *in addition to* the 8.5% Ticket Tax that minor league clubs already paid under the 2004 PBA.

45. Under MLB's proposal, each major league club would receive four PDLs that it could issue to four minor league clubs, thereby "entitl[ing] [the chosen club] to similar rights as existed under the [PBA]." Each PDL would last for 10 years. The MiLB Business Plan further stated that in the event a PDL "Holder" (i.e., a minor league club) does not receive an affiliation after the expiration of any 10-year term of the PDL, it would "receive[] [a] guaranteed buyout."

46. With no Plan B in place, the National Association had no ability to push back against the highly unfavorable terms presented by MLB. Ultimately, the Negotiating Committee allowed the PBA to expire, leaving the National Association members without any leverage, and forcing many of them to sign unfavorable contracts directly with MLB.

47. Notwithstanding his knowledge of MLB's proposal, on September 30, 2020, the day the PBA expired, the Negotiating Committee, issued the following misleading press release:

> "For more than a century, Major League Baseball (MLB) and Minor League Baseball (MiLB) have worked together to grow the game of baseball into America's Pastime. The current agreement between MLB and MiLB expires today. Minor League Baseball's negotiators have been meeting with MLB to reach a new agreement – one that would continue the relationship with MLB and preserve affordable, family-friendly entertainment in each of our 150 communities across the nation. Minor League Baseball will continue to work in good faith over the coming weeks to reach a well-designed and fair agreement that meets MLB's player development needs and continues the relationship between the two for generations to come."

10

48. On information and belief, the members of the Negotiating Committee breached their fiduciary duties to the other members of the National Association by secretly acquiescing to MLB's proposal, to the detriment of the 43 minor league clubs that would be excluded.

49. O'Connor warned of allowing the Negotiating Committee to spearhead negotiations with MLB because it was comprised of a "group with 'skin in the game,' precisely because those in ownership may have interests (or perceived interests) at odds with the interest of other owners."

50. As it turns out, O'Conner's fears were realized. Of the 12 minor league clubs owned directly or indirectly by the individual members of the Negotiating Committee, all but one was issued a new PDL.

51. Goldklang profited from his self-dealing as a member of the Negotiating Committee by ensuring that his two minor league affiliated clubs were not part of the contraction. Moreover, as a result of the contraction, the value of the remaining affiliated teams drastically increased. For example, in the several years immediately prior to the contraction in 2021, two Class A (long) season clubs in the Carolina league (where the RiverDogs played) were sold for between $11 million. Also, in the several years immediately prior to contraction in 2021, two Class A (low) season clubs in the Penn League (where the Renegades played) was sold for between $6.5 and $9 million. Conversely, on information and belief, when Goldklang sold the Renegades in late 2021 following contraction and its elevation to Class A (high), the purchase price was roughly $20 million.

52. Not only did the members of the Negotiating Committee ensure their own teams' survival, including the RiverDogs and the Renegades, Goldklang actually received a new MLB Class AAA affiliation for the Saints. In short, Goldklang's previously unaffiliated team jumped ahead of all 43 teams that were contracted and received not only an affiliation, but the most valuable affiliation possible. By obtaining this affiliation, Goldklang increased the teams value

11

by more than $25 million. For example, in 2019, independent baseball clubs were marketed for sale between $850,000 and $4.5 million, depending on the financial success of the specific team. Conversely, in 2022 a Class AA team sold for $29 million.

53. The members of the Negotiating Committee acted in their own self-interest and to the detriment of the other National Association members, including SEI.

54. In September 2020, the PBA expired, and the Negotiating Committee had failed to obtain a new agreement between MLB and MiLB. Instead, MLB began entering into direct agreements with the minor league clubs. On or about December 9, 2020, MLB issued its list of 120 MiLB teams that would be eligible to receive contracts to affiliate with one of MLB's 30 member teams. SEI was not on that list.

55. Following the expiration of the PBA, MLB completed the process of issuing PDLs to 120 clubs, almost all of which were members of the NAA. On information and belief, in the first week of December 2020, MLB privately notified the 120 entities that had been selected by a major league club as an "operator" under a new PDL. Finally, in early 2021, after repeated inquiries, MLB finally affirmed to SEI that the Volcanoes had not been selected as an "operator" under one of the PDLs.

56. On information and belief, in 2019, MLB established an internal valuation metric and assigned values to the minor league clubs. Based on MLB's own internal valuations, Class A – Long Season (High-A) teams had an estimated value of $10 million.

57. As a direct result of the failure to negotiate a new PBA on behalf of all members of MiLB and SEI's subsequent disassociation with MiLB, SEI suffered damages in an amount to be proven at trial, currently estimated to be $7 million, which represents the loss in value to SEI's ownership of the Volcanoes club.

58. After decades working together towards the common mission of promoting professional minor league baseball, SEI was stabbed in the back by its those, including Mr.

Goldklang, that had been entrusted to advocate on its behalf, all for personal financial gain. SEI is now left with no league to play in, no coaches, no players, and an empty stadium with no games to play.

**Count 1**
(Breach of Contract)

59. SEI realleges paragraphs 1 through 58 and incorporates them herein.

60. SEI is a member of the National Association, whose membership is governed by the National Association Agreement (NAA).

61. Mr. Goldklang and/or Goldklang Group, as owners of the RiverDogs and Renegades, are parties to the NAA as the terms of the NAA apply not only to member clubs but also their owners.

62. Mr. Goldklang and/or Goldklang Group breached the NAA by, among others, entering into negotiations with MLB to "become a member of" and cooperating with MLB to create a new structure for minor league baseball that conflicts "with the letter and spirit of [the NAA]" and "the interest of any of the clubs operating under it ***," including the Volcanoes.

63. Mr. Goldklang and/or Goldklang Group further violated the NAA by becoming "a party to any agreement that would result in the immediate cessation of operations of" the Volcanoes.

(Breach of Contract/Count 2 – Covenant of Good Faith and Fair Dealing)

64. Goldklang and/or Goldklang Group further violated the NAA by breaching the implied covenant of good faith and fair dealing by actively conspiring to secure MLB affiliations for his own baseball clubs at the expense of the loss of affiliation for 43 minor league clubs, including the Volcanoes.

13

65. As a direct and proximate cause of the breaches by Mr. Goldklang and/or Goldklang Group, SEI suffered damages in an amount to be proven at trial, but not less than $7 million.

## Count 2
(Breach of Fiduciary Duties)

66. SEI realleges paragraphs 1 through 58 and incorporates them herein.

67. As a result of the delegation of the National Association's president's authority, Mr. Goldklang owed fiduciary duties to the National Association membership, including SEI. Those duties include, without limitation, a duty of loyalty, fair dealing, and full disclosure of all matters affecting the business of the National Association.

68. Mr. Goldklang breached his fiduciary obligations by failing to represent all members of the National Association in the negotiations with MLB and violating the express terms of the NAA.

69. Mr. Goldklang also breached fiduciary obligations by self-dealing and putting his own economic interests above those of SEI.

70. Mr. Goldklang's conduct in breaching his fiduciary duties to SEI has damaged SEI by reducing the value of SEI's business in the amount of not less than $7 million.

## Count 3
(Restitution/Unjust Enrichment)

71. SEI realleges paragraphs 1 through 58 and incorporates them herein.

72. Mr. Goldklang breached his fiduciary obligations by failing to represent all members of the National Association in the negotiations with MLB and violating the express terms of the NAA.

73. Mr. Goldklang also breached fiduciary obligations by self-dealing and putting his own economic interests above those of SEI.

74. Mr. Goldklang and/or Goldklang Group benefited, financially, from the improper conduct of Mr. Goldklang.

75. SEI is entitled to restitution in the amount of the gain to Mr. Goldklang and/or Goldklang Group arising from the increase in value for each of his/its teams, which gain is estimated to be not less than a combined $40 million.

## **Prayer for Relief**

WHEREFORE, Plaintiff prays for a judgment as follows:

1. On Count 1, judgment against Mr. Goldklang and Goldklang Group, jointly and severally, for $7 million;

2. On Count 2, judgment against Mr. Goldklang for $7 million;

3. On Count 3, against Mr. Goldklang and Goldklang Group in an amount to be proven at trial, but not less than $40 million;

4. An award of pre- and post-judgment interest at the legal rate;

5. An award of Plaintiff's costs and disbursements incurred in this action; and

6. For any other relief the court deems just and appropriate.

**Demand for Jury Trial**

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

DATED:  New York, New York
April 19, 2023

Respectfully Submitted,

DAVIS WRIGHT TREMAINE LLP

By:  *s/ Mohammad B. Pathan*
John M. Magliery*
Mohammad B. Pathan
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Tel:  212.489.8230
johnmagliery@dwt.com
mohammadpathan@dwt.com

TARLOW NAITO & SUMMERS LLP
Alexander Naito*
2014 NE Broadway
Portland Oregon 97232
Tel:  503.968.9000

 **pro hac vice* application forthcoming*

*Attorneys for Plaintiff Sports Enterprises, Inc.*