# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---------------------------------------------------------------- x

SPORTS ENTERPRISES, INC., an Oregon
corporation,

       Plaintiff,

   - against -

MARVIN GOLDKLANG, an individual,

       Defendant.

:
:
:
:
:
:
:
:
:
:
:
:
:

---------------------------------------------------------------- x

Case No. 2:23-CV-02198-JKS-AME

Demand for Jury Trial

## <u>SECOND AMENDED COMPLAINT</u>

DAVIS WRIGHT TREMAINE LLP
John M. Magliery*
Mohammad B. Pathan
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Tel: 212.489.8230

TARLOW NAITO & SUMMERS, LLP
Alexander Naito, *pro hac vice*
2014 NE Broadway
Portland, Oregon 97232
Tel: 503.968.9000

*Attorneys for Plaintiff*
*SPORTS ENTERPRISES, INC.*

*to be admitted *pro hac vice*

## L. CIV. R. 10.1 DISCLOSURE

Plaintiff:      Sports Enterprises, Inc., 6700 Field of Dreams Way NE, Keizer, OR  97303
Defendant:   Marvin Goldklang, 21 Coventry Road, Livingston, NJ  07039

## NATURE OF THE CASE

1.     This litigation involves a unique, century-long union between small-town minor league baseball clubs for the purpose of advocating for the common benefit of the enterprise that would become known as minor league baseball ("MiLB").  Starting in 1901, minor league teams and leagues, each of whom had separate relationships with various major league baseball ("MLB") clubs, joined forces to collectively bargain for their rights and benefits by forming the National Association of Professional Baseball Leagues, Inc. ("National Association").  The National Association, along with its member leagues and clubs, were bound together through a set of bylaws known as the National Association Agreement ("NAA").  The charter for National Association stated its objectives, which included: "promote and protect the interest of such baseball leagues as may qualify to operate under [the NAA]"; and "maintain and further develop a strong relationship with [MLB] based on mutual respect and consideration while *enhancing the continuing advancement and growth* of those people who serve the game."  The NAA provided for a Board of Trustees ("BOT") made up of owners and representatives from various MiLB clubs, to oversee the organization and act in the best interests of the National Association and its member leagues and clubs.  For the last 26 years, plaintiff Sports Enterprises, Inc. ("SEI") owned and operated one of those minor league clubs, known as the Salem-Keizer Volcanoes (the "Volcanoes").

2.     For over 100 years, MiLB successfully battled against the goliath of MLB and its vastly superior financial position by remaining unified, negotiating collective benefits— including most importantly guaranteed affiliation with an MLB club for all 160 MiLB clubs. Negotiations with MLB occurred roughly every 10 years, going back to the early 1900s, each time resulting in a new Professional Baseball Agreement ("PBA").  PBA negotiations could be

1

contentious.  For example, in 1996, the negotiations failed to result in a new PBA prior to the expiration of the then existing PBA.  Nevertheless, the MiLB clubs remained unified behind the National Association and MLB eventually came back to the negotiating table and a new PBA was agreed to.

3.     However, in the most recent negotiations with MLB to extend or replace the PBA that was set to expire in late 2020, defendant Marvin Goldklang, a member of the BOT, breached his fiduciary obligations to all MiLB clubs, including the Volcanoes, by undermining the negotiation process to secure his own private deals to financially benefit himself and his company, M.S. Goldklang & Co., Inc. ("Goldklang Group").  In doing so, Goldklang caused the demise of the National Association, which directly led to the Salem-Keizer Volcanoes' loss of MLB affiliation and, essentially, its entire value.  Goldklang's conduct was intentional.  Not only did he have a financial interest in an MLB club (the New York Yankees), which directly benefited by the undoing of the National Association, his actions also increased the value of Goldklang Group's ownership interest in its MiLB and non-MiLB (so called "independent") clubs by over $40 million overnight.

4.     Goldklang was not simply one of several actors to contribute to the fall of the 120-year-old unified group of owners and the governing entity—the National Association. Goldklang had a financial interest in an MLB club while serving as a BOT member.  Goldklang inserted himself into the negotiation process and forced the National Association president to give up control of the negotiations with MLB to a sub-group of BOT members (the "Negotiating Committee").  Goldklang, by all accounts, acted as the leader of the Negotiating Committee. Goldklang communicated continuously with representatives of MLB outside formal negotiations. Goldklang was the individual that Pat O'Conner, the president of the National Association expressed concerns about during the negotiations.  Last, Goldklang secured a *new* affiliation with

an MLB club for an independent team he held a majority interest in through his company, the Goldklang Group, following the downfall of the National Association.

## PARTIES

5.      SEI is an Oregon corporation with its principal place of business in Marion County, Oregon.  SEI owns and operates the Volcanoes who, for 26 years prior to 2021, was a member of the National Association and a Class Single-A (low) affiliate of the San Francisco Giants, a professional baseball team with MLB.  Following the 2020 season, the Volcanoes became an independent baseball club with no affiliation with any MLB club.

6.      Goldklang is an individual who is a citizen of the State of New Jersey, domiciled at 21 Coventry Road, Livingston, Essex County, New Jersey 07039, where he maintains his true, fixed, and permanent home and place of habitation.

7.      At all material times, Goldklang was a member of the BOT of the National Association, a non-profit corporation organized under the laws of the State of Florida.  Members of the BOT were entrusted as fiduciaries under Florida law, the express terms of the NAA, and common law, and charged with protecting the interests of the National Association, its 14 member-leagues, and the 160 MiLB clubs operating under the NAA.

8.      At all material times, Goldklang was a limited partner (*i.e.* minority co-owner) of the New York Yankees, an MLB club.

9.      On information and belief, at all material times, Goldklang was the majority and/or controlling owner of the Goldklang Group.

9.1.      Goldklang Group is a New Jersey corporation with its principal place of business in Essex County, New Jersey.

9.2.      On information and belief, at all relevant times, the MiLB club known as the Charleston RiverDogs was majority owned and controlled by the Goldklang Group.  Prior to 2021, the RiverDogs were a member of the National Association and an affiliate of the New

York Yankees of MLB, playing in the Carolina League, a Single A – Long Season league. Following the 2020 season, the RiverDogs became a Class A (low) affiliate of the Tampa Bay Rays.

9.3.    On information and belief, prior to 2021, the MiLB club known as the Hudson Valley Renegades was majority-owned and controlled by Goldklang Group.  Prior to 2021, the Renegades were a member of the National Association and an affiliate of the Tampa Bay Rays of MLB, playing in the New York Penn League, a Single A – Short Season league. Following the 2020 season, the Renegades became a Class A (high) affiliate of the New York Yankees.

9.4.    On information and belief, at all relevant times, the independent baseball club St. Paul Saints was majority-owned and controlled by Goldklang Group.  Prior to 2021, the Saints were an independent baseball team with no affiliation with MLB.  Following the 2020 season, the Saints became a Class AAA affiliate of the Minnesota Twins of MLB.

### JURISDICTION AND VENUE

10.    This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the dispute is between citizens of different states.

11.    This court has personal jurisdiction over Mr. Goldklang because he is a resident of the State of New Jersey and subject to personal jurisdiction in a court of general jurisdiction in the State of New Jersey pursuant to N.J. Ct. R. 4.

12.    Venue is proper under 28 U.S.C. § 1391 because defendant resides in the State of New Jersey.

**BACKGROUND**

*A.    The National Association Agreement*

13.    On September 6, 1901, various minor baseball leagues and clubs formed the National Association to advocate collectively for the rights and benefits of minor league baseball leagues and minor league clubs nationwide.

14.    The National Association members include both leagues and clubs.  Each MiLB club belonged to a league with a designated classification.  Each league established its own set of bylaws, but every league incorporated the terms of the NAA into its bylaws, thereby making any violation of the terms of the NAA a violation of the league's bylaws.  For example, the bylaws of the New York Penn League ("NYPL") specifically provided that any violation of the NAA would also constitute a violation of the NYPL bylaws.  In general, the leagues merely served to represent its club, as the leagues had no ownership or for-profit purpose.  Conversely, as with MLB clubs, each of the MiLB clubs were independently owned and operated as for-profit entities.

15.    The NAA was not merely a "commercial" agreement, it also acted as the "constitution and bylaws" of the National Association and its member leagues and member clubs pursuant to Fla. Stat. § 617.0202 and Fla. Stat. § 617.0206.  As stated in the preamble to the NAA:  "Therefore, through this Agreement we define our governing rights in baseball, identifying our purpose and *pledging our united everlasting support for* the game and *our organization*."  Attached hereto as Exhibit A is a true and correct copy of the NAA.

16.    The NAA contained numerous references to MiLB clubs as "members" and established that the clubs and their owners are parties to the NAA and otherwise agreed to be bound by its terms, including without limitation:

16.1.    Under Section 21, "PARTIES BOUND BY AGREEMENT," the NAA expressly refers to both "leagues and clubs."

16.2.    Attachment A to the NAA specifically identifies the Hudson Valley and the Charleston clubs (both owned and operated by Goldklang Group), as well as Salem-Keizer club (owned and operated by SEI), as parties.

16.3.    The NAA, adopted in Chicago on September 6, 1901, concludes with the following:  "This Agreement shall be and is binding *** upon any and all associations, leagues and clubs now members of this association, hereafter becoming parties to this National Association Agreement."

16.4.    Section 6.18 provides for "club members" to initiate a conference on realignment of the leagues.

16.5.    Section 8.01 limits the rights of "any member league or club."

16.6.    Section 10.03 gives the BOT the authority to set "membership fees for each year in an amount assessed against each club in the several classifications under this Agreement for support of the National Association office and protection of territory."

16.7.    Section 15 establishes a uniform player development contract as the "only agreement between a National Association club and a Major League club."

16.8.    Section 19.05 requires all "National Association clubs" to play all games according to the Official Baseball Rules.

16.9.    Section 21 states the following:  "The member leagues and their constituent clubs recognize that it is in the best interests of baseball that all actions taken and decisions by the Board of Trustees, the President and the Board of Appeals under the authority of this Agreement be accepted and complied with by the leagues and clubs.  ***  In furtherance thereof, the leagues and clubs (on their own behalf and including, without limitation, on behalf of their owners, officers, directors, and employees) severally agree to be finally and unappealably bound by such actions and decisions."

16.10.   Section 19.03(A) applies equally to the clubs, as well as their owners and officers, because the NAA extends all contractual obligations to club owners and officers.

17.     In addition, for decades all MiLB clubs and their owners acted as parties to the NAA and, by conduct, agreed to be bound by its terms.  For example, on information and belief, for over 27 years the Goldklang Group, on behalf of the Renegades and RiverDogs, paid membership fees to the National Association, complied with the Major League Rules standards, and otherwise acted in all ways consistent with enforcing rights afforded to and performing obligations on parties of the NAA.

18.     The NAA provided that the National Association be governed by the BOT.  The BOT members had various duties and responsibilities, including, among others:

18.1.   The BOT had plenary powers to determine policies, enact rules and regulations consistent with the objectives of minor league baseball.

18.2.   The BOT had all corporate powers of the National Association, except for those enumerated powers retained by the National Association membership or powers allocated to other branches by the terms of the NAA.

18.3.   The BOT had the power to determine policies and enact rules and regulations necessary and proper for carrying into execution the objectives of the National Association.

18.4.   Most importantly, the NAA expressly provided that the members of the BOT were required to act at all times as *trustees* of the National Association and all decisions and actions of the BOT must be made for the benefit of *the National Association* and its leagues and clubs as a whole.

19.     The NAA also provided for corporate officers, including a President.  The President had plenary and exclusive authority to negotiate with MLB on behalf of the National Association *and* its member clubs, subject to approval by the general membership.  In other

words, the President had a duty to act on behalf of each MiLB club with respect to the contractual rights and responsibilities between the MLB clubs and their MiLB affiliates. The BOT retained oversight over the President and was the only body that could enact policies and laws of the National Association. The President's role was limited to enforcing and otherwise administering the NAA.

20.    By participating in minor league baseball, each MiLB clubs gave up rights to individually negotiate with MLB, thereby placing the biggest contributing factor to the financial success or failure of each club into the hands of the BOT and the President.

21.    The NAA provided MiLB clubs (including the Volcanoes) numerous rights, benefits and privileges, including, among others:

      21.1.    The primary privilege was the exclusive, and guaranteed affiliation with an MLB club.

      21.2.    The guaranteed affiliation, in turn, resulted in each MiLB club receiving players under contract with MLB clubs at little or no cost to the MiLB club. In other words, by being a MiLB club with an MLB affiliation, MLB paid all the players, even those in the farm system. As a result, the MiLB clubs did not incur the substantial (and often prohibitive) expense of paying their players.

      21.3.    The limited number of guaranteed affiliations also ensured a stable market for these clubs to be bought and sold, thereby maintaining the high values noted below. Other privileges included territorial protections from infringement by other MiLB clubs and royalties from certain intellectual property. The NAA also provided for financial compensation to be paid to impacted MiLB clubs in the event any new non-affiliated club joined the National Association (essentially a buy-in fee to be paid by the joining club).

22.    In exchange for the rights and privileges noted above, all MiLB clubs, and their owners, agreed to adhere to certain standards, abide by certain limitations, and fulfill various

obligations owed to the National Association and other MiLB clubs.  For example, all MiLB clubs (and their owners) agreed (i) to "promote and protect the interests of such baseball leagues as may qualify to operate under" the NAA; (ii) "maintain and further develop a strong relationship with [MLB]"; (iii) not "enter into any negotiation to become a member of or in any way cooperate with any organization of professional baseball clubs whose existence will in any manner conflict with the letter and spirit of this Agreement, or the interest of any of the clubs operating under it ***"; (iv) pay an annual fee to the National Association; (v) refrain from infringing on the territorial rights of other MiLB clubs; (vi) accept penalties (*e.g.* fines) imposed by the President for violating the certain rules or conduct; and (vii) allow for independent approval authority by the National Association and MLB over any transfer of ownership in any MiLB club.

23.     In exchange for the rights and privileges noted above, MiLB clubs also agreed to forego certain opportunities.  For example, the NAA also incorporated Major League Rules ("MLRs"), which established the numerous rules and regulation game rules that all MiLB clubs agreed to adhere to.

23.1.     MLR 53 set out rules regulating expansion, contraction, relocation and reclassification of minor league clubs, with all such changes requiring approval from the MLB.

23.2.     MLR 54 required notification and approval from the Commissioner for any change in ownership of a minor league club.  The rule also required detailed annual financial disclosures to the MLB for each minor league club and required the clubs maintain minimum equity to debt ratio, with penalties imposed for failure to maintain the required ratio.

23.3.     MLR 56 set out the terms of the uniform Player Development Contract ("PDC") as the "one and only" form of working agreement or contract permitted between a major league club and a minor league club.  Rule 56 further sets out rules defining when and how PDC affiliations could be terminated or new affiliations entered into.  Rule 56 specifically

prohibited a major league club from offering a minor league club economic benefits different than those provided for under the standard PDC agreement.

23.4.    The terms and conditions of each PDC (as required by MLR 56) also set out specific rules regarding the operation of the minor league clubs, including requiring the affiliated major league club to provide an active roster of skilled players and managers, coaches, instructors, and trainers for the minor league club.  The PDC also set out specific allocations of team-related expenses between the major league club and the minor league club, including player salaries, travel expenses, uniform expenses, and expenses for baseball bats and balls.

23.5.    MLR 56 also provided that, in the final year of the term of a PDC, a major league club must give written notice of its intention to terminate its PDC with a minor league affiliate.  Failure to provide such notice "shall make the [major league] Club ineligible to terminate its PDC."

23.6.    MLR 57 specified travel standards for minor league clubs governing all travel and lodging for players and staff, including limits on type of vehicle used (no more than 75 miles in a van and no more than 500 miles by bus without an off day).

23.7.    MLR 58 set forth detailed development standards for minor league clubs' playing facilities, including standards for the playing field and team facilities.

24.    Each MiLB club invested substantial resources over the years to adhere to these rules and regulations by paying for stadium improvements, player transportation, etc.  Moreover, each MiLB club had to forgo numerous financially beneficial opportunities to stay in compliance.  The clubs were willing to make the investment and forgo the business opportunities because each team knew that all the other MiLB clubs were playing by the same rules, and all were united together.

25.    The NAA also established certain tiers for MiLB clubs.  The top tier designated as "Triple-A" included thirty MiLB clubs, and generally had a fair market value of between $50

and $100 million.  The second tier designated as "Double-A" included 60 MiLB clubs, which generally had a fair market value of between $25 and $50 million.  The third tier designated as "High-A" included 30 clubs with a value between $12 and $20 million.  The fourth tier designated as "Low-A" included 30 clubs with a value between $10 and $20 million.  Both High-A and Low-A were also referred to as "Single A – Long Season."  The last tier designated as Single A – Short Season, included 40 clubs (including the Volcanoes and the Renegades) with a value between $6 and $18 million.  The value of MiLB clubs resulted primarily from the exclusive status as a member of the National Association and their exclusive affiliations with MLB clubs.  In fact, in recent years MiLB clubs that brought in little or no net income were sold for values in the ranges described above.

26.    Outside of the MiLB structure existed "independent" clubs that did not have any MLB affiliation.  Many independent clubs had little value because they did not come with the "status" of being part of MLB.

**B.    The Professional Baseball Agreement**

27.    Since at least 1903, the National Association, on behalf of its minor league club members, negotiated various agreements with the Office of the Commissioner of Baseball (the "Commissioner"), the unincorporated entity governing all MLB clubs.  Specifically, the National Association negotiated and entered into various PBAs with MLB.  Since 1903 (until winter 2020), there had been, in some form, a PBA in place between the National Association and MLB.  Each PBA included a term (usually five or ten years) to provide an opportunity for the parties to update the terms and renegotiate based on market and other changes.  But the PBA always got renewed.

28.    Unlike other professional sports (for example the National Basketball Association's "G League" that is owned by the NBA), MLB did not have its own "farm" system.  Instead, MLB relied entirely on its relationship with the National Association and the MiLB

clubs to provide the infrastructure and operations necessary for the placement and development of players not yet ready for MLB (or players performing injury rehabilitation).  MLB could not operate its minor league farm system without its relationship with the National Association and the MiLB clubs.

29.     The PBA governed the relationship between the National Association and MLB and effectively controlled the relationship between MiLB clubs and their MLB club affiliates. Each MiLB club executed a one-page PDC with its MLB club affiliate, which essentially just incorporated the terms of the most recent version of the PBA negotiated by the National Association.

30.     At all relevant times prior to 2021, SEI had a PDC with the San Francisco Giants.

31.     On information and belief, at all relevant times prior to 2021, Goldklang Group had a PDC with two MLB clubs, the New York Yankees (for the RiverDogs affiliation) and the Tampa Bay Rays (for the Renegades).

32.     MiLB clubs *did not* independently negotiate terms with their MLB affiliates; rather, they relied on the National Association.  By being a member of the National Association, each MiLB club agreed that, in order to maintain its affiliation, it had to give up its individual negotiating rights and agree to whatever deal the National Association and MLB struck; not all that dissimilar from how the MLB players are bound by the collective bargaining agreement negotiated between MLB and the Major League Baseball Players Association.

33.     For over 100 years, the PBA between MLB and the National Association was renewed over and over again, always being renewed, albeit with modifications negotiated between the parties.

34.     In 1990, the National Association and MLB agreed to certain modifications to the prior PBA.  Specifically, the 1990 Professional Baseball Agreement ("1990 PBA") contained one significant change from previous editions:  MLB agreed to at all times have its major league

clubs maintain an affiliation with a minimum number of minor league clubs (at the time, 119 total minor league affiliations). In essence, the 1990 PBA served as a grant of exclusive right to an affiliation for all National Association members.

35. The 1990 PBA also standardized the affiliation process by creating the standardized PDC that would be executed by each major league club and any affiliated minor league club.

36. The most recent iteration of the PBA occurred in 2004 (the "2004 PBA"), which was effective from October 1, 2004, through September 30, 2020. The 2004 PBA, together with the MLRs, which were incorporated verbatim into the 1990 PBA and 2004 PBA, set forth the terms and conditions of the relationship between the National Association and MLB.

37. The 2004 PBA expanded the membership of the National Association and the number of exclusive affiliations that would be maintained with MLB clubs from 119 to 160. The 2004 PBA was set to expire on September 30, 2020.

## C.    *The Volcanoes*

38. In 1989, Jerry Walker and his former business partner William Tucker acquired SEI, which at the time owned and operated the Bellingham (Washington) Mariners and later the Bellingham Giants.

39. In 1994, SEI entered into a four-year term PDC (to begin during the 1995 season) with the MLB club known as the San Francisco Giants (the "Giants") for SEI (first as the Bellingham Giants and later as the Volcanoes) to be the Giants' short season single-A team affiliate playing in the Northwest League ("NWL"). The PDC incorporated all the terms and conditions as set forth by MLB and MiLB in the PBA. For the next 26 years, through the end of 2020, SEI continuously maintained a contractual relationship with the Giants (through two-year extensions of that PDC).

40.     In 1997, in reliance on its membership in the National Association and the protections afforded under the NAA, SEI relocated the team to Keizer, Oregon.

41.     Since at least 1989, SEI and its owners contributed substantial sums, as well as time, supporting the National Association, including, without limitation, payment of membership fees.

42.     From 2015 to present, SEI invested approximately $500,000 in upgrades to the stadium and surrounding facilities, many at the direct request of the Giants.  These upgrades included adding a 5,200 sq./ft. indoor hitting facility and batting cages and adding a players' lunchroom and coaches' locker-room.  Prior to that, SEI had also added a 1,000 sq./ft weight room.

43.     On information and belief, in 2018, the Tri-City Dust Devils, a Class A – Short Season team and member of the National Association, received an offer to be purchased for $8.1 million.

44.     At all material times, SEI was a member in good standing with the National Association under the NAA.

**D.     *The PBA Negotiations***

45.     In early 2019, MLB began discussions with the National Association regarding negotiation of a new PBA.

46.     The National Association had considerable bargaining power when negotiating with MLB.  The National Association represented all 160 minor league clubs, each with stadiums (either leased or owned), fan bases, infrastructure (parking, concessions, etc.), contracts with vendors and advertising, and various licenses and trademarks.  Not to mention substantial other key benefits such as, in the case of the Volcanoes, a network of local host families that housed the MLB players.  MLB had over 4,000 minor league players that needed a place to live, practice, and play.  Without access to the MiLB system, it would not have been feasible for MLB

to simply find an alternative, thereby substantially impairing each of the billion-dollar MLB franchises. Not only that, but MLB was also acutely aware of the public and political backlash it would face from pulling its product out of so many small (often rural) communities.

47.     As part of those initial discussions, MLB proposed the idea of contracting some minor league clubs as part of the new PBA because MLB wanted to reduce the number of minor league players that each team had on its payroll. MLB also wanted to have more control over accommodations and other aspects related to the player-experience. On information and belief, MLB envisioned over time acquiring more MiLB clubs to bring the entire system under the banner of MLB or its owners, much like the NBA and other professional sports leagues.

48.     In the fall of 2019, MLB presented a proposal to MiLB for terms of a new PBA. That initial proposal involved reducing the number of PDCs down to 120, but also provided for the establishment of a "Dream League" for the 40 teams that would potentially lose affiliation. The Dream League teams would be provided various support and other privileges. In other words, at this point in the process, MLB had conceded to (i) renewing a new PBA between the National Association and MLB; and (ii) providing at least some rights, privileges, and benefits to all 160 MiLB clubs.

49.     Unsurprisingly based on Goldklang's role as part owner of the Yankees, MLB's proposed contraction plan in October 2019 greatly benefited the Goldklang Group. Specifically, that initial proposal provided that the Renegades would move up from Short Season to High-A and the St. Paul Saints would receive a new AAA affiliation.

50.     However, on Information and belief, MLB's initial proposal also included the concept of certain MiLB clubs or independent clubs *paying* into some type of fund for the benefit of gaining an affiliation or moving up in classification (for example, from Low-A to AA). Based on this initial concept, the Renegades would have paid $2 million, the RiverDogs would have paid $2 million, and the St. Paul Saints would have paid $20 million into a common fund.

51.     In October 2019, it was further reported and made well known to all involved that teams losing affiliation or going down in classification would expect to be compensated for the loss and that one possible source of funds to provide that compensation would be the money obtained from teams gaining an affiliation or going up in classification.  This idea was consistent with the NAA that contained similar provisions with respect to new clubs joining the National Association (*i.e.* such teams would pay a fee that would be paid out to clubs affected by the new addition).

52.     Said another way, under this initial proposal by MLB, Goldklang Group would have been required to pay $24 million into a common fund to compensate teams affected by the contraction, including the Volcanoes.

53.     In October 2019, MLB leaked an initial proposed contraction list of the 43 teams that would not be included under the new agreement (the "Contraction List").

54.     Following the disclosure of the Contraction List, the National Association, through its president, Pat O'Conner, notified MiLB members that MiLB would never agree to contraction of some of its teams and that MiLB would remain united.

55.     During the course of these initial discussions regarding a new PBA, the National Association specifically told MLB that loss of an affiliation with a major league club would result in the contracted minor league teams going out of business.

56.     Initially, Pat O'Conner led the negotiations for a new PBA on behalf of MiLB. At all times O'Conner publicly and privately maintained that any new deal with MLB would not result in the loss of affiliation for any of the 160 MiLBs (except for the teams in the Appalachian league, which were all wholly owned by MLB anyway).

57.     On information and belief, during these initial discussions, Goldklang was communicating directly with representatives from MLB about the negotiations.

58.    In November 2019, Goldklang used his power and influence to get the BOT to pressure President O'Conner to give up his role in negotiating with MLB and instead created the Negotiating Committee, made up of members of the BOT to carry out the negotiations with MLB.

59.    On November 6, 2019, the BOT held a special meeting and voted to authorize the President to appoint members of the BOT to a Negotiating Committee.  The BOT formally passed a resolution to establish a negotiating committee to represent MiLB in its negotiations with MLB.  By and through that resolution, Pat O'Conner formally delegated his "plenary and exclusive power over relations with Major League Baseball" under the NAA to negotiate a new PBA, to a committee of minor league club owners.  The BOT further voted in that resolution to indemnify members of the Negotiating Committee so long as their actions were "taken as Committee members in good faith *for the benefit of the National Association as a whole* as contemplated in NAA Section 4.02."

60.    Goldklang forced his way on to the Negotiating Committee from the very beginning.  Goldklang was the only member of the Negotiating Committee with ownership in an MLB club and the only member with ownership of an independent team that was seeking an MLB affiliation.  Despite this conflict, Goldklang not only refused to recuse himself, he insisted on his participation on the Negotiating Committee.

61.    By accepting the appointment to serve on the Negotiating Committee, Goldklang knowingly and intentionally accepted the role and responsibility for the negotiations with MLB on behalf of all MiLB clubs.

62.    By his own words, Goldklang acknowledged that by serving on the Negotiating Committee he was acting on behalf of all MiLB clubs.  On November 18, 2019, the Negotiating Committee, including Goldklang, sent a letter to MLB informing MLB that, going forward, the Negotiating Committee "will be representing *MiLB*" in the PBA negotiations.  Then on

November 22, 2019, the Negotiating Committee penned another letter addressed to "Minor League Baseball *Clubs* and Leagues" informing the clubs that the committee had met with MLB to discuss "the various issues that you are all familiar with (facilities, travel, *PDCs*, etc.)" and that the committee would be meeting again with MLB in December 2019.

63.    During late 2019 and most of 2020, the Negotiating Committee provided regular updates on the negotiations directly to all MiLB clubs, including the Volcanoes, further demonstrating that members of the Negotiating Committee knew and understood their role as fiduciaries for all MiLB clubs.  Similarly, in part based on these updates, as well as the actual authority of the National Association to represent MiLB clubs in negotiations with MLB, MiLB clubs, including the Volcanoes, reasonably believed that Goldklang was acting as a fiduciary and furthering the interests of all MiLB clubs in the negotiations with MLB.

64.    As a member of the National Association, the Volcanoes had placed its trust and confidence, as well as its financial interests with respect to its PDC and the relationship with MLB, in the hands of the National Association.  In fact, by the terms of the NAA, the Volcanoes were prohibited from negotiating directly with MLB.  Based on that and the numerous representations by the Negotiating Committee that it was, in fact, negotiating on behalf of all MiLB clubs, the Volcanoes *did not* pursue its own negotiations with MLB or take other steps to secure its future with MLB during 2020.

65.    While on the BOT, Goldklang actively resisted numerous calls for the National Association to hire outside legal counsel to handle the negotiations with MLB.  Goldklang used his position and influence to ensured that he and the rest of the Negotiating Committee would have exclusive control over the negotiations.

66.    Goldklang's conduct on the Negotiating Committee was governed by the NAA and his authority derived from that delegated by the President.  So when O'Conner tasked the Negotiating Committee with negotiating an extension of the existing PBA or a new similar type

of agreement with MLB on behalf of its member leagues and all 160 minor league clubs.  In fact, in December 2019, the Negotiating Committee acknowledged this limitation on its authority by representing to all MiLB clubs that the committee's authority was limited to negotiating terms that did not involve elimination of Minor League teams in good standing.  In other words, Goldklang did not have the authority to negotiate any deal to the contrary.  Yet that is exactly what he did.

67.    In January 2020, Goldklang met privately with representatives of MLB to discuss a plan to contract MiLB clubs.  In fact, throughout the negotiations, Goldklang had substantial contacts directly with MLB outside the formal negotiations and shared with MLB confidential information that he learned through his role on the BOT and the Negotiating Committee.

68.    In January 2020, Goldklang contacted Dave St. Peter, president of the MLB club Minnesota Twins, to keep him apprised of the negotiations for the purpose of eventually obtaining an affiliation for the St. Paul Saints.

69.    In February 2020, Goldklang and others submitted a proposal to MLB that conceded contraction of two teams from the Northwest League ("NWL") (which was known to include the Volcanoes), while preserving ten teams in the NYPL and providing for compensation for NYPL teams that did not receive affiliation (again, at the time Goldklang Group's Renegades were in the NYPL).

70.    Around this same time, the Negotiating Committee internally discussed providing compensation for teams losing affiliation from funds collected by charging a fee to independent teams that would receive an MLB affiliation.  This idea was also discussed internally at MLB. However, on information and belief, Goldklang negotiated away any proposed fee so that his team, the St. Paul Saints, would not incur that expense.

71.    In and around April 2020, O'Conner expressed concerns internally about the authority of the Negotiating Committee to negotiate a franchising/licensing agreement that

"bypassed or eliminated the [National Association] and its Leagues completely." In response, the Negotiating Committee "strongly disagreed" with O'Conner's "efforts at transparency with the membership" and persuaded him to wait until they received MLB's proposal, as opposed to developing a "Plan B" in case a new PBA could not be reached.

72.      At the same time, in April 2020, the Negotiating Committee represented to the National Association membership, including all MiLB clubs, that it was encouraged by the progress and had reached agreement on a number of points with MLB.

73.      Yet behind the scenes, Goldklang was already working to eliminate the 43 teams for his own benefit. In a statement to the other members of the Negotiating Committee, Goldklang stated that "[w]e have been advised by MLB that the net result [of contracting 43 teams] will be lower costs and higher revenues for [120] MiLB clubs. *A major focus of the ongoing negotiations is* for the MiLB Negotiating Committee to both better understand the new economics being suggested *and to ensure that [the remaining 120] Minor League owners will be protected with long-term affiliation agreements*."

74.      Thus, contrary to the representations by the Negotiating Committee, Goldklang was secretly negotiating the terms of the new franchise system that MLB wanted. On May 14, 2020, the Negotiating Committee submitted to MLB a list of 14 "Proposed Agreement Principles." As part of those principles, the Negotiating Committee proposed a limited minor league system of only 120 teams, with two new teams that had not previously been affiliated with MiLB, a minimum season length of 140 games for all minor league teams, and certain other restrictions for the "protection of franchise equity values" of the minor league teams. Another "principle" proposed by the Negotiating Committee stated:

> "MLB to indemnify MiLB, its leagues, members and representatives
> against any liability related to a new agreement including but not limited
> to claims by owners of teams that currently have a PDC but MLB has
> determined will not get a Standard License under the new agreement and

teams that MLB has determined will receive Standard License to play in a lower level league than that team is currently playing in."

75.     The Proposed Agreement Principles made no mention of the 43 teams that would be eliminated as part of the proposal.  No mention of compensation, no mention of paying entrance fees to other independent leagues, no mention of the Dream League.  In as few as five months, the Negotiating Committee managed to negotiate *away* a new PBA (which MLB had proposed in the fall) and negotiate *away* any benefits for the contracted teams (which MLB had proposed in the fall).

76.     At this same time, in May 2020, Goldklang again met with Minnesota Twins' President Dave St. Peter and Jim Pohlad, executive officer of the Twins and a member of the Pohlad family, who have owned the Twins since 1984.

77.     Also in and around May 2020, O'Conner issued a written notice to all minor league clubs and their representatives, including all members of the Negotiating Committee, reminding them that pursuant to the terms of the NAA and MLRs, they were prohibited from entering into "any negotiation to become a member of or in any way cooperate with any organization of professional baseball clubs whose existence will in any manner conflict with the letter and spirit of the [NAA], *or the interest of any of the clubs operating under it ***""* (emphasis added).

78.     In and around June or July 2020, because of his concerns that members of the BOT and the Negotiating Committee were acting against the interests of the National Association, O'Conner disbanded the Negotiating Committee and took back control over the negotiation with MLB.  In early August 2020, O'Conner submitted a new proposal to MLB.  At that point, it appeared too late to undo the damage done by Goldklang and the Negotiating Committee.  Accordingly, on information and belief, O'Conner's proposal included a proposed realignment of MiLB clubs.  However, his proposal included the Volcanoes on the list of clubs to

continue to hold an affiliation.  O'Conner's proposal also included substantial benefits to teams that would lose affiliation or change classification.

79.    Most importantly, O'Conner's proposal would have maintained the National Association's governance over minor league baseball.  On information and belief, O'Conner also proposed that the St. Paul Saints pay compensation of $42.5 million for admission into MiLB to be used to compensate clubs losing affiliation.

80.    In response to O'Conner's actions, the BOT, likely at the urging of Goldklang, held an informal meeting on or about August 7, 2020.  None of the corporate formalities required to hold a special meeting of the BOT were followed.  At the meeting, the BOT voted to authorize one or more minor league club owners to contact MLB directly and inform MLB that the BOT would create a new committee of its members to continue negotiations, all without O'Conner's consent.  On information and belief, a minor league club owner did in fact contact MLB and indicated that O'Conner would be replaced in the negotiations with MLB.

81.    Following this impermissible vote by the BOT, the BOT re-established the original Negotiating Committee with BOT members, include Goldklang.  Within weeks, O'Conner resigned as president.

82.    On or about August 27, 2020, MLB responded to the Negotiating Committee's initial proposal with its "MiLB Business Plan," adopting many of the "principles" proposed by the Negotiating Committee, including a plan to replace the PBA system with a new franchise-based system and reduce the number of minor league clubs from 160 to 120.  Notably, however, as part of its response, MLB further committed that as part of any new agreement, MLB would meet with MiLB clubs that do not receive a Player Development License Agreement in order to "facilitate the form of baseball that is best for that community in 2021 and beyond."

83.     Ultimately, the Negotiating Committee sat back and allowed the PBA to expire. Unlike in 1996, the last time the PBA expired without a renewal deal in place, Goldklang had ensured that the National Association would be in disarray and without any leverage.

84.     Despite all that had transpired, on September 30, 2020, the day the PBA expired, the Negotiating Committee, issued the following misleading press release:

> "For more than a century, Major League Baseball (MLB) and Minor League Baseball (MiLB) have worked together to grow the game of baseball into America's Pastime. The current agreement between MLB and MiLB expires today. Minor League Baseball's negotiators have been meeting with MLB to reach a new agreement – one that would continue the relationship with MLB and preserve affordable, family-friendly entertainment in each of our 150 communities across the nation. Minor League Baseball will continue to work in good faith over the coming weeks to reach a well-designed and fair agreement that meets MLB's player development needs and continues the relationship between the two for generations to come."

85.     In reality, Goldklang and the Negotiating Committee were only interested in getting the best deal they could for their teams, and had no intention of following through with any sort of deal that would have incorporated MLB's multiple offerings to assist the clubs losing affiliation.

86.     Shortly after the expiration of the PBA, Goldklang and other members of the BOT transferred all MiLB trademarks and tradenames to MLB for no consideration.

87.     In the following months, Goldklang worked directly with representatives from MLB to negotiate terms for the new franchise contract that would be used to affiliate MLB and MiLB teams.

88.     In early 2020, MLB Professional Development Leagues, LLC contracted directly with 120 teams pursuant to a uniform agreement called a Player Development License ("PDL") Agreement.  Despite still being members of the National Association, Goldklang Group's two affiliated teams, the Renegades and the RiverDogs, executed PDLs with MLB Professional Development Leagues, LLC, and the Renegades actually moved up to Single-A full season

classification.  Moreover, the St. Paul Saints also signed a PDL with MLB Professional
Development Leagues, LLC at the AAA classification.  On information and belief, the Saints did
not pay any fee as part of receiving an affiliation.

89.     The PDLs contained the following provisions for the benefit of minor league
clubs negotiated by the Negotiating Committee:  (i) a term of 10 years, not five like MLB
wanted; (ii) an "evergreen" clause that provided that if an MiLB club met certain benchmarks,
the PDL would be extended; (iii) creation of a fund for the purpose of compensating certain PDL
licensees in the event their PDL agreement with licensor was terminated in connection with the
reduction in the number of PDL clubs; (iv) a provision that protected the licensee (i.e., the minor
league club) against paying MLB fees if revenue was negative (allowing the team to carry over
those potential fees and only have them applied to future gains); and (v) creation of an
"Executive Board" made up of equal members of MLB and MiLB owners to address various
issues and make recommendations to the Commissioner.

90.     O'Connor warned of allowing the Negotiating Committee to spearhead
negotiations with MLB because it was comprised of a "group with 'skin in the game,' precisely
because those in ownership may have interests (or perceived interests) at odds with the interest
of other owners."  O'Conner also expressed his view that Goldklang was the person in control of
the Negotiating Committee and expressed concern over Goldklang's ability to use his influence
with MLB to cause harm to the National Association.

91.     As it turns out, O'Conner's fears were realized because, among other reasons:

91.1.   By far and away, it was Goldklang that profited the most from the historic
and unprecedented shift in the relationship between MLB and the clubs that made up
professional baseball's farm system.

91.2.   Goldklang profited from his self-dealing as a member of the BOT and the
Negotiating Committee by steering the negotiations towards contraction while at the same time

ensuring that his two minor league affiliated clubs and his independent club would not be left without a chair when the music stopped.

91.3.    Goldklang managed to secure an AAA affiliation for the St. Paul Saints and orchestrated a sale within a matter of months after signing a PDL, and secured a higher affiliation for the Renegades and also sold that team within a matter of months after signing a PDL.

92.    However, as a result of the contraction, the value of Goldklang's affiliated teams drastically increased.  For example, in the several years immediately prior to the contraction in 2021, two Class A (long) season clubs in the Carolina league (where the RiverDogs played) were sold for approximately $11 million each.  Also, in the several years immediately prior to contraction in 2021, two Class A (short) season clubs in the Penn League (where the Renegades played) were sold for between $6.5 and $9 million.  Conversely, on information and belief, in December 2021, Goldklang Group sold the Renegades to Dimond Baseball Holdings for $22 million.  Dimond Baseball Holdings was run by Peter Freund, referred to by Goldklang as a "friend and partner" for the last 15 years.  During 2019 and 2020, Mr. Freund was employed by MLB and worked closely on the restructuring of minor league baseball.

93.    Goldklang Group's unaffiliated team, the Saints, jumped ahead of all 43 teams that were contracted and received not only an affiliation, but the most valuable affiliation possible—a Class AAA team.  By obtaining this affiliation, Goldklang Group increased the team's value by more than $50 million.  For example, in 2019, independent baseball clubs were marketed for sale between $850,000 and $4.5 million, depending on the financial success of the specific team.  Conversely, in 2022, on information and belief, Goldklang Group sold the St. Paul Saints to Dimond Baseball Holdings for $55 million.

94.     While serving as a member of the BOT and the Negotiating Committee, Goldklang acted in his own self-interest and in the best interests of the Goldklang Group, to the detriment of the other National Association members, including SEI.

95.     In September 2020, the PBA expired, and the Negotiating Committee failed to obtain a new agreement between MLB and MiLB.  Instead, MLB began entering into direct agreements with the minor league clubs.  On or about December 9, 2020, MLB issued its list of 120 MiLB teams that would be eligible to receive contracts to affiliate with one of MLB's 30 member teams.  SEI was not on that list.

96.     Following the expiration of the PBA, MLB completed the process of issuing PDLs to 120 clubs, almost all of which were members of the NAA.  On information and belief, in the first week of December 2020, MLB privately notified the 120 entities that had been selected by a major league club as an "operator" under a new PDL.  Finally, in early 2021, after repeated inquiries, MLB finally affirmed to SEI that the Volcanoes had not been selected as an "operator" under one of the PDLs.

97.     On information and belief, in 2019, MLB established an internal valuation metric and assigned values to the minor league clubs.  Based on MLB's own internal valuations, Class A – Long Season (High-A) teams had an estimated value of $10 million.

98.     As a direct result of the failure to negotiate a new PBA on behalf of all members of MiLB and SEI's subsequent disassociation with MiLB, SEI suffered damages in an amount to be proven at trial, currently estimated to be $7 million, which represents the loss in value to SEI.

99.     After decades working together towards the common mission of promoting professional minor league baseball, SEI was stabbed in the back by Goldklang, who had been entrusted to advocate on its behalf, all for personal financial gain.  SEI is now left with no league to play in.

100.    By working behind the scenes with Goldklang to undermine the National Association, MLB was able to further its stated goal of bringing more of minor league baseball under the control of MLB owners, as with most other professional sports leagues.

### Count 1
(Breach of Fiduciary Duties)

101.    SEI realleges paragraphs 1 through 100 and incorporates them herein.

102.    At all relevant times, the National Association was a non-profit corporation formed under the laws of the State of Florida.  Pursuant to the internal affairs doctrine, the laws of the State of Florida control.

103.    Under Florida law, specifically Fla. Stat. § 617.083, as a member of the BOT within the National Association Goldklang was, for relevant purposes, a board of director.

104.    Under Florida law, specifically Fla. Stat. § 607.083, all members of the BOT, including Goldklang, owed SEI the fiduciary duty to act in good faith, with care of an ordinarily prudent person, and in the best interests of the National Association and its leagues and clubs.

105.    Under applicable state law, Goldklang owed a duty of loyalty to the National Association and its member clubs as an agent acting on behalf of the National Association with respect to its dealings with MLB.

106.    In addition, MiLB clubs gave over control of the relationship with MLB and its clubs to the National Association.  Through its actions in 2019 and 2020, the BOT members on the Negotiating Committee, in particular Goldklang, exercised that control and, as a result, assumed the responsibility to further the economic interests of SEI and all the member clubs vis-a-vis the relationship with MLB.  As a result, members of the BOT, including Goldklang, were in a special relationship with the National Association MiLB clubs and, accordingly, owed common law fiduciary duties.   Those duties include, without limitation, a duty of loyalty, fair dealing, and full disclosure of all matters affecting the business of the National Association.

107.    In addition, based on his participation on the Negotiating Committee to assume the responsibility to perform the obligations of the National Association with respect to negotiations with MLB, a position for which he entered into voluntarily and knowingly, Goldklang assumed additional fiduciary duties towards the National Association membership. Goldklang and the rest of the Negotiating Committee repeatedly informed the MiLB clubs that they were negotiating for the benefit of the organization and the entire membership. As a result of the National Association's responsibilities and authority on behalf of all MiLB clubs, Mr. Goldklang owed fiduciary duties to the National Association member clubs, including SEI, who placed their trust and confidence in Goldklang.  Those duties include, without limitation, a duty of loyalty, fair dealing, and full disclosure of all matters affecting the business of the National Association.

108.    Goldklang breached his fiduciary obligations by not acting in good faith, not acting in the best interests of the National Association, acting in his own personal interests, and failing to use reasonable care to avoid the dissolution of the National Association by, among others, the following ways:

108.1.  Goldklang failed to recuse himself based on his substantial conflicts of interest.

108.2.  Goldklang failed to keep the National Association membership informed regarding the negotiations with MLB, including information indicating that MLB proposed eliminating the National Association and replacing it with a system of franchises or license agreements entered into directly between the major league club and the minor league club affiliates.

108.3.  Actively attempting to fracture the unity of the National Association membership in negotiations with MLB.

108.4.  Failing to take reasonable steps, and in fact actively resisting implementing reasonable measures as part of the negotiations with MLB to protect all its clubs, such as hiring outside legal counsel.

108.5.  Failing to secure any rights or benefits for disaffiliated MiLB clubs despite MLB's consistent and unwavering commitment to provide some resources to disaffiliated clubs.

108.6.  Failing to follow proper corporate governance with respect to relevant meetings, including failing to give proper notice to membership, and exceeding his authority as a BOT member by negotiation with MLB without authority.

108.7.  Affirmatively undermining the role of the organization's offices by holding secret votes to oust the President of the National Association.

108.8.  Negotiating with MLB clubs privately for the benefit of his unaffiliated team, the St. Paul Saints, while serving as both a member of the BOT and the Negotiating Committee.

108.9.  Acting in ways to promote his own self-interest to the detriment of the organization and its members, including SEI, by, among others, negotiating away a compensation fund to be paid by teams that gained an affiliation or moved up in classification.

109.    Goldklang also breached fiduciary obligations by self-dealing and putting his own economic interests above those of SEI.

110.    The breach by Goldklang directly and proximately caused, or at least was a substantial factor in causing the dissolution of the National Association, causing SEI to lose its affiliation with MLB, resulting in damages in an amount to be proven at trial, but currently estimated to be approximately $7 million, after applying appropriate credits and offsets.

## **Prayer for Relief**

WHEREFORE, Plaintiff prays for a judgment as follows:

1.      Judgment against Goldklang in an amount to be proven at trial, but not less than $7 million;

2.      An award of pre- and post-judgment interest at the legal rate;

3.      An award of Plaintiff's costs and disbursements incurred in this action; and

4.      For any other relief the court deems just and appropriate.

## **Demand for Jury Trial**

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

DATED:  New York, New York
        April 17, 2024.

Respectfully Submitted,

DAVIS WRIGHT TREMAINE LLP

By:  *s/ Mohammad B. Pathan*
        John M. Magliery*
        Mohammad B. Pathan
1251 Avenue of the Americas, 21st Floor
New York, New York 10020
Tel:  212.489.8230
Johnmagliery@dwt.com
Mohammadpathan@dwt.com

TARLOW NAITO & SUMMERS, LLP
Alexander Naito
2014 NE Broadway
Portland, Oregon 97232
Tel:  503.968.9000

*Attorneys for Plaintiff*
*SPORTS ENTERPRISES, INC.*